# IN THE COURT OF APPEALS OF IOWA

No. 14-0060
Filed April 22, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**STACEY JOHN PITSENBARGER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Adair County, Richard B. Clogg,

Judge.


        Defendant directly appeals from his conviction and sentence for three

counts of sexual abuse in the third degree. **REVERSED AND REMANDED.**



        Joseph R. Cahill of Cahill Law Offices, Nevada, for appellant.

        Thomas J. Miller, Attorney General, Sheryl Soich, Heather Quick, and

Sharon K. Hall, Assistant Attorneys General (appeal), and Michael Maynes,

County Attorney, and Douglas D. Hammerand, and Susan Krisko, Assistant

Attorneys General (trial) for appellee.



        Heard by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DANILSON, C.J.**

Stacey Pitsenbarger directly appeals from his conviction and sentence for three counts of sexual abuse in the third degree, in violation of Iowa Code sections 702.17 and 709.4(2)(c)(1) (2009). On appeal, Pitsenbarger maintains trial counsel was ineffective for failing to object to expert testimony that vouched for the witness's credibility both directly and indirectly. Pitsenbarger also claims the trial court erred in admitting hearsay evidence over Pitsenbarger's objection.

Upon our de novo review, we find the expert's testimony constituted vouching for the witness's credibility and trial counsel had a duty to object to such testimony. Additionally, because we lack confidence Pitsenbarger received a fair trial and conclude the result may have been different if proper objections had been made, we find Pitsenbarger was prejudiced by counsel's failure. This issue is dispositive, and we do not consider Pitsenbarger's remaining claims of error. We reverse the judgment of conviction and sentence and remand this case for new trial.

**I. Background Facts and Proceedings.**

Stacey and Deana Pitsenbarger were married in 2004. T.P. and her sisters were placed in foster care with the Pitsenbargers in 2005, and the Pitsenbargers adopted the three girls in 2007.

On August 26, 2010, T.P. told three of her friends at school Pitsenbarger had been sexually abusing her. T.P. repeated the allegations to the school counselor the same day, and the Iowa Department of Human Services (DHS) was contacted. T.P. was interviewed by Mauxie King, a child protection worker

for DHS. T.P. reported that Pitsenbarger had sexual intercourse with her in May 2010.

A few days later, T.P. was interviewed by Dawn Wood at a child protection center. T.P. told Wood that Pitsenbarger had intercourse with her on one occasion and oral sex with her on one occasion in the upstairs bedroom at the house in town.

In September 2010, T.P. was removed from the Pitsenbarger home and placed in foster care. T.P. was later moved to a youth shelter in March of 2011 where she resided until she was placed at Four Oaks, a residential facility in Monticello.

As part of her therapy at Four Oaks, T.P. was to keep a "lies journal" in which she was told to record lies that she had told in the past. In May 2011, T.P. included the allegations of sexual abuse in her lies journal. She wrote that she made up the allegations because she wanted to be able to move in with her friend J.S. T.P. had previously told Wood that her ideal home would be living with J.S.

Approximately two weeks later, T.P. advised the staff at Four Oaks that she had lied in her "lies journal" when she recanted her allegations of sexual abuse.

Pitsenbarger was charged by trial information on August 21, 2012. He was initially charged with one count of sexual abuse in the third degree, in violation of Iowa Code sections 709.4(2)(c)(1) and 702.17. Pitsenbarger entered a plea of not guilty.

T.P.'s deposition was taken in December 2012. During the deposition, she stated that Pitsenbarger had sexual intercourse with her two times and oral sex with her once, for a total of three instances of sexual abuse. When asked why the allegations were different from when she was interviewed by Wood, T.P. stated that she chose not to tell Wood the truth.

On January 14, 2013, the State filed an amended trial information charging Pitsenbarger with three counts of sexual abuse in the third degree. Pitsenbarger again entered a plea of not guilty to each of the counts.

Both the State and Pitsenbarger filed motions in limine, which were heard immediately before the commencement of trial on July 10, 2013. The State's motion included a request to exclude "[a]ny witnesses testifying about the credibility of other witnesses." Pitsenbarger's trial counsel agreed that, "with respect to a witness testifying about the credibility of other witness, I agree that witnesses can't come in and do that."

At trial, T.P. testified it was her chore to do the dinner dishes and that she had to wait to do them until the other children had showered because of water pressure issues in the home. She then had to take her shower at night before she went to bed. She also testified that Deana bowled on Monday and Thursday nights from approximately 7 p.m. to 9 or 10 p.m.

T.P. estimated Pitsenbarger had started coming into the bathroom to watch her shower in September 2009. On occasion, T.P. would help Pitsenbarger with his music business, and she would accompany him to events. T.P. stated that on the way to one of the events, Pitsenbarger rubbed her leg and tried to put his hand up her shorts. T.P. also testified Pitsenbarger told her he

wanted to marry her when she turned eighteen. Pitsenbarger showed her pornography on his computer at home and also once showed her magazines with pictures of naked women. T.P. testified about three instances of sexual abuse. She said she first told her friend J.S. in the spring of 2010 Pitsenbarger had watched her shower. The next fall, she told three of her school friends— J.S., H.M., and H.L.—that Pitsenbarger was sexually abusing her. T.P. acknowledged that she recanted her allegations in the "lies journal." She testified she wanted to be able to return to her home and live with her little sister again. Once she realized she was not going to be able to return, she stated that her recantation was a lie. T.P. denied making up the allegations so she could live with J.S. instead of the Pitsenbargers. T.P. testified that her memory about the events had improved over time because she experiences "flashbacks" and "takes [her]self back to when it happened." She admitted she had issues with truthfulness in her past and that she did not tell Wood all of the details of abuse during the forensic interview.

Over defense's objection, J.S. was allowed to testify that, in the spring of 2010, T.P. told her that Pitsenbarger had watched her shower. Again over objection, J.S. and H.M. both testified that in fall of 2010, T.P. began crying during choir class and, when asked what was wrong, told them Pitsenbarger was sexually abusing her. H.L. testified similarly, but Pitsenbarger did not object.

Wood was called as an expert witness to testify about "child abuse dynamics." During her testimony, she testified about the concepts of grooming, delayed disclosure, active disclosure, minimization, and recantation. On cross-examination, the following exchange occurred:

Q. So you're not here to say that every time a child alleges sex abuse that means it happens are you? A. No.

Q. And, in fact, would you agree that sometimes a child can allege sex abuse and it didn't happen? A. Yeah. Our research shows that there is 4.7 or about 5 percent of children who make allegation—or false allegations. That's the statistic. And within that 5 percent or less, most of those false allegations are in collusion or another adult figure coaching the child to make that false allegation.

On redirect examination, the prosecutor then asked Wood:

Q. Okay. So you mentioned that the statistics are only 5 percent of hundreds of thousands of allegations of child sexual abuse have been proven to be false? A. Correct.

Q. You mentioned most of those are with collusion of another person. So can you tell the jury was "collusion" actually means? A. Sure. To me, "collusions" means that there is another adult who is coaching or telling the child what to say or encouraging that child to make the false allegation. Most of false allegations are—Most false allegations within that 5 percent are shown to be in divorce or custody situations where one parent might be coaching the other child. So we have that 5 percent, and then within that 5 percent are by an adult.

Deana testified that T.P. was untruthful and unhappy in their home. She also testified that her and Pitsenbarger's bedroom door did not have a lock and the daycare children were out of their home by 6 p.m.—statements in direct contradiction to T.P.'s testimony.

Pitsenbarger testified in his own defense and denied all of the allegations.

During closing argument, the prosecutor said, "[T.P.] had to give you details, details which the defendant agreed to—well, except for the sex part," and "[Pitsenbarger] [a]grees with [T.P.] on almost everything except what makes it a crime." When characterizing Deana's testimony, the prosecutor said, "Deana Pitsenbarger came in, and, you know, she says, 'Well, I assumed some stuff happened.'" The prosecutor ended closing argument, stating. "Ladies and gentleman, *we* brought this case to you because the defendant is guilty. . . . The

defendant did something horribly, horribly wrong. He had sex with his adopted daughter—not once, twice and oral sex another time. And we ask you find him guilty of all those counts. Thank you." (Emphasis added.)

During the defense's closing argument, Pitsenbarger's attorney referred to "weasel words" in Wood's testimony and called the studies she relied on "junk science." During the State's rebuttal closing argument, the prosecutor stated:

> [Wood] doesn't say whether or not she believes [T.P] because that's your job, but the purpose she gives you that background, ladies and gentlemen, is so you can apply that background to the facts of this case and then ask yourselves, "What happened with [T.P.], is that what happens with kids?"
>
> Now, [defense counsel] wants to call it junk science. Did you hear any testimony besides [defense counsel] saying that? Did you hear Miss Wood saying it was junk science? No. We have the burden of proof. Did [defense counsel] bring any expert in to say it was junk science? Did he cross-examine Miss Wood with any of those studies—any of those? Did he cross-examine her with other studies to show it's wrong? No, because those studies, that's what they do.
>
> And it wasn't just the Sweden study that had 12 children. On redirect [the other prosecuting attorney] asked Miss Wood if she was familiar with other studies. There was an example, anecdotal. She had an example. Those studies are there for a reason.

On July 15, 2013, the jury returned a guilty verdict on each of the three counts of sexual abuse in the third degree.

On August 22, 2013, Pitsenbarger filed a motion for new trial, and the State resisted. An evidentiary hearing was held on the matter on December 16, 2013. The district court denied Pitsenbarger's motion and proceeded directly to sentencing. Pitsenbarger was sentenced to a term of incarceration not to exceed ten years for each of the three counts, which the court ordered to run concurrently.

Pitsenbarger appeals.

**II. Standard of Review.**

A defendant may raise an ineffective-assistance claim on direct appeal if he has reasonable grounds to believe the record is adequate for us to address the claim on direct appeal. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). If we determine the record is adequate, we may decide the claim. *Id.* We review claims of ineffective assistance of counsel de novo. *Id.*

We review hearsay rulings for correction of errors at law and will reverse the admission of hearsay evidence as prejudicial unless the contrary is shown. *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). We review all other evidentiary rulings for an abuse of discretion. *Id.*

**III. Discussion.**

On appeal, Pitsenbarger raises several claims of error. Pitsenbarger maintains he received ineffective assistance by trial counsel. He maintains counsel was ineffective for failing (1) to object to expert testimony that vouched for the witness's credibility both directly and indirectly, (2) to seek admission of evidence the witness has been sexually abused before, and (3) to object to several alleged instances of prosecutorial misconduct. Pitsenbarger also claims the trial court erred in admitting hearsay evidence over Pitsenbarger's objection.

**A. Ineffective Assistance of Counsel.**

Pitsenbarger claims his attorney failed to object to inadmissible evidence and prosecutorial misconduct. Thus, trial counsel did not preserve error. However, the claim of ineffective assistance of counsel is an exception to the error preservation rule. *Ledzema v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

To prevail on a claim of ineffective assistance of counsel, Pitsenbarger must prove by a preponderance of the evidence (1) the attorney failed to perform an essential duty and (2) prejudice resulted from the failure. *State v. Rodriguez*, 804 N.W.2d 844, 848 (Iowa 2011). To prove counsel failed to perform an essential duty, he must show "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). Pitsenbarger must overcome a strong presumption of counsel's competence. *Id.* at 689. To establish prejudice, he must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The claim fails if either element is lacking. *See Everett v. State*, 789 N.W.2d 151, 159 (Iowa 2010)

***1. Expert testimony—vouching.*** Pitsenbarger maintains he received ineffective assistance because trial counsel allowed an expert witness to vouch for T.P.'s credibility without objecting.

Our supreme court recently decided a trio of cases regarding what constitutes vouching for a witness, both directly and indirectly. *See State v. Dudley*, 856 N.W.2d 668 (Iowa 2014); *State v. Brown*, 856 N.W.2d 685 (Iowa 2014); *State v. Jaquez*, 856 N.W.2d 663 (Iowa 2014). In each case, the court expressed the following:

> Although we are committed to the liberal view on the admission of psychological evidence, we continue to hold expert testimony is not admissible merely to bolster credibility. Our system of justice vests the jury with the function of evaluating a witness's credibility. The reason for not allowing this testimony is that a witness's credibility "is not a 'fact in issue' subject to expert opinion." Such opinions not only replace the jury's function in determining credibility, but the jury

can employ this type of testimony as a direct comment on defendant's guilt or innocence. Moreover, when an expert comments, directly or indirectly, on a witness's credibility, the expert is giving his or her scientific certainty stamp of approval on the testimony even though an expert cannot accurately opine when a witness is telling the truth. In our system of justice, it is the jury's function to determine the credibility of a witness. An abuse of discretion occurs when a court allows such testimony.

*Dudley*, 856 N.W.2d at 676; *Brown*, 856 N.W.2d at 689; *Jaquez*, 856 N.W.2d at 665.

Pitsenbarger challenges several comments made by the State's expert witness, Dawn Wood. As instructed by our supreme court in *Dudley*, we must break down each statement Pitsenbarger "claims as objectionable to determine if the State crossed the line." 856 N.W.2d at 678. On cross-examination of Wood, the following exchange occurred:

Q. So you're not here to say that every time a child alleges sex abuse that means it happens are you? A. No.
Q. And, in fact, would you agree that sometimes a child can allege sex abuse and it didn't happen? A. Yeah. Our research shows that there is 4.7 or about 5 percent of children who make allegation—or false allegations. That's the statistic. And within that 5 percent or less, most of those false allegations are in collusion or another adult figure coaching the child to make that false allegation.

Pitsenbarger contends the answer after the word "Yeah" was voluntary and unresponsive. He also contends defense counsel should have moved for a mistrial either because it was improper vouching for the credibility of a witness or in violation of the order in limine. Minimally, Pitsenbarger contends defense counsel should have moved to strike the voluntary and unresponsive portion of

the answer which would have prevented the State's follow-up embellished question on redirect examination.[1]

On redirect examination, the prosecutor then asked Wood:

> Q. Okay. So you mentioned that the statistics are only 5 percent of hundreds of thousands of allegations of child sexual abuse have been proven to be false? A. Correct.
>
> Q. You mentioned most of those are with collusion of another person. So can you tell the jury was "collusion" actually means? A. Sure. To me, "collusions" means that there is another adult who is coaching or telling the child what to say or encouraging that child to make the false allegation. Most of false allegations are—Most false allegations within that 5 percent are shown to be in divorce or custody situations where one parent might be coaching the other child. So we have that 5 percent, and then within that 5 percent are by an adult.

Pitsenbarger maintains counsel was ineffective for again failing to object to Wood's testimony. He maintains counsel should have objected that it was not a proper subject for expert testimony as it was indirectly vouching for T.P.'s credibility. Moreover, he contends the prosecutor's statement was a misstatement of the evidence as there was no testimony of "hundreds of thousands" allegations. Pitsenbarger contends counsel again should have moved for a mistrial. Pitsenbarger also argues the defense counsel's "silence further emboldened the prosecution to repeat the inadmissible expert opinion during final argument" as "the crown jewel and crescendo of her final argument."

In *State v. Myers*, 382 N.W.2d 91, 93 (Iowa 1986), an expert witness was allowed to testify, over objection of the defense, "In all the years I've worked, which is sixteen, I have only had one child that lied to me about sexual abuse, and it is my opinion that it is very rare for a child to lie about this subject." When

---

[1] The State agrees on appeal that Wood's answer to the question on cross-examination opened the door for the prosecutor to further address the issue.

asked if this opinion was formed based on certain statistics or facts, the same witness elaborated, "I did read a statistic based on the Giaretto Program in San Jose, which was one of the first programs in sexual abuse investigation, and their finding was that perhaps one in 2,500 children who were interviewed did not tell the truth, which would make it exceedingly rare." *Id.* Similarly, the principal of the complaining witness's school was also called to testify as an expert witness and testified that in her experience as principal for three years, no child had lied to her about "something like this." *Id.* at 92. The State maintained the testimony was a proper subject for the expert because it aided the jury in understanding the general truthfulness of children who have claimed sexual abuse. *Id.* However, our supreme court ruled:

> When viewed in light of the factual issues, this contention is unrealistic. The credibility of the eight-year-old child was a fighting issue between the parties. The gist of the principal's testimony was that during her three-year period as principal no child had lied to her about being sexually abused; the investigator opined that in 16 years of work she had only one child lie to her about sexual abuse. The prosecutor's obvious purpose in offering this expert testimony was to bolster the complainant's credibility. We believe the effect was comparable to telling the jury that the complainant would not lie about matters concerning sexual abuse.

In *State v. Tracy*, 482 N.W.2d 675, 678 (Iowa 1992), the complaining witness had initially claimed she was sexually abused but later recanted her testimony. At trial, her doctor testified he believed the complaining witness had told the truth when she first reported sexual abuse. *Tracy*, N.W.2d at 678. The doctor also testified "there are probably no more than two or three children per thousand who come forth with such serious allegation who are found later to be dishonest." *Id.* Our supreme court found "that the admission of Dr. Comly's

testimony concerning the truthfulness of [the witness's] testimony is in violation of our holding in *State v. Myers*." *Id.* The court ultimately held the defendant was provided ineffective assistance due trial counsel's failure to object to the admission of Dr. Comly's testimony and a *Turecek* violation[2] by the State, and the defendant was given a new trial. *Id.* at 678–80.

Here, Wood's testimony that only five percent of children lie about sexual abuse and then usually only after coaching by an adult constitutes indirect vouching for T.P.'s credibility. As in *Myers*, the complaining witness's credibility was a fighting issue between the two parties. Here, there was no physical evidence of the alleged abuse and no witnesses other than the complaining witness, T.P. Additionally, like *Tracy*, the complaining witness here had once recanted her initial claim.

Wood's one word sentence of "Yeah" answered the question, and the remaining voluntary and unresponsive statement by Wood was objectionable as indirectly vouching for T.P.'s credibility and contrary to the order in limine. Pitsenbarger's trial counsel failed to perform an essential duty when he failed to object to Wood's voluntary statement about the general truthfulness of children on cross-examination and when he failed to object to her testimony about it again on redirect examination.

Pitsenbarger also contends defense counsel should have objected during the State's case-in-chief. He argues the State, in its case-in-chief, presented the expert testimony of Dawn Wood by walking the expert through the alleged facts to vouch for T.P.'s credibility with the use of statistics, reports, and opinions.

_____

[2] *See State v. Turacek*, 456 N.W.2d 219, 224–25 (Iowa 1992).

Although the State's direct examination of Wood did not refer to or encompass T.P.'s testimony, Pitsenbarger argues the expert was asked to give her "stamp of approval" on every aspect of T.P.'s testimony. Wood answered questions relating to grooming, delay in reporting, cooperation in keeping a secret, offenders offending against a child when other people are in the home, children most often first disclosing to another child, recantation being typical and not depicting a false claim, mothers not being supportive of the child when the father is the alleged abuser, and children pushing boundaries with the next caretaker.

In *Dudley*, our supreme court reaffirmed its long standing prohibition of such expert testimony, stating, "We see no reason to overturn this well-settled Iowa law prohibiting an expert witness from commenting on the credibility of a victim in a criminal sex abuse proceeding." 856 N.W.2d at 677. In considering the current status of expert testimony regarding sex abuse trauma the court also stated:

> To allow an expert witness to testify a child's physical manifestations or symptoms are consistent with sexual abuse trauma or CSAAS[3] allows the expert witness to indirectly vouch that the victim was telling the truth because the expert opines the symptoms are consistent with child abuse. To put it another way, the expert is saying these symptoms mean the child suffered a sexual abuse trauma; therefore, the child must be telling the truth when he or she relates his or her story to the jury. It is the jury's function to determine if the victim is telling the truth, not the expert witness's.

*Id.* In reaching this conclusion, the supreme court also noted, "the identification of symptoms or physical manifestations of sexual abuse trauma in children is not consistent among professionals." *Id.*

---

[3] Child Sexual Abuse Accommodation Syndrome.

The State attempted to sanitize its direct examination of Wood by not specifically referencing the testimony, past statements, past actions, and past behaviors of T.P. However, in a methodical process Wood bolstered T.P.'s credibility by testimony via statistics,[4] reports, and opinions on each of T.P.'s past statements, actions, and behaviors. To testify a child's symptoms are consistent with abuse is improper. *Id.* In this action, the expert testified to every significant purported and disputed fact, including behaviors and out-of-court statements as being consistent with the statistics and reports and thus, corroborating T.P.'s testimony and lending credence to it.

A similar approach was taken in *State v. Pansegrau*, 524 N.W.2d 207, 211 (Iowa Ct. App. 1994), where we remanded for a new trial and stated, "The hypothetical question outlined all the events the alleged victim had testified preceded the rape. This personalized the opinion and conclusion. The court here admitted testimony beyond the careful exception carved in *Gettier*." (referencing *State v. Gettier*, 438 N.W.2d 1, 6 (Iowa 1989)). Moreover, the supreme court's ruling in *Dudley* clearly reflects expert testimony that indirectly or implicitly attempts to match up behaviors that are observed in known sex abuse victims with the complainant's behaviors constitutes vouching for the complainant's credibility. 856 N.W.2d at 677–78. We conclude the State

---

[4] Specifically, Wood relied on the following statistics in her testimony: 72 to 100 percent of kids do not disclose abuse; only 11 percent of children actively disclose at first opportunity; 53 percent of mothers are not protective of children after they disclose; 65 percent of mothers are not supportive of a disclosing child; and only 5 percent of children who allege sexual abuse make false allegations and "most" of those are caused by collusion with an adult.

crossed the line in its direct examination of Wood and defense counsel failed to object to the form of questioning.[5]

We also find no solace in the State filing its own motion in limine contending no witness should speak upon the credibility of another witness and then proceeding to present testimony vouching for the credibility of T.P. Equally unconvincing is the State's effort in direct examination of Wood to establish that the purpose of her testimony was to not "make conclusions about what the child said or whether or not the abuse occurred." An expert's own testimony that she is "neutral" does not make it so. The same is true concerning the question poised to the expert that the purpose of the expert's testimony is not to invade the jury's role—with a corresponding answer by the expert, "correct." None of these efforts cleanse or whitewash the improper vouching. We recognize the State's desire to present expert testimony to support their prosecution. However, our system of justice does not rely upon the statistical probabilities of certain conduct absent scientifically proven principles but rather relies upon the jury to determine the credibility of witnesses to reach its verdict. *Id.*

*2. Duty.* Although we find Wood's testimony as vouching for the credibility of T.P., this is a direct appeal premised upon ineffective assistance of counsel. Accordingly, our review requires consideration of the two-prong test previously explained and established in *Strickland*, 466 U.S. at 688.

---

[5] "An attorney need not be a 'crystal gazer' who can predict future changes in established rules of law in order to provide effective assistance to a criminal defendant." *State v. Effler*, 769 N.W.2d 880, 889 (Iowa 2009). We acknowledge the trio of cases— *Brown*, *Jasquez*, and *Dudley*—were not decided by our supreme court prior to the trial in this action. However, the published case of *Pansegrau*, 524 N.W.2d at 211, was issued well before, and the trio of cases merely recognized a long-standing principle. *See Dudley*, 856 N.W.2d at 676.

We generally preserve ineffective-assistance-of-counsel claims for postconviction-relief proceedings. *State v. Utter*, 803 N.W.2d 647, 651 (Iowa 2011); *see also* Iowa Code § 814.7(3) ("If an ineffective assistance of counsel claim is raised on direct appeal from the criminal proceedings, the court may decide the record is adequate to decide the claim or may choose to preserve the claim for determination under chapter 822.") "Only in rare cases will the trial record alone be sufficient to resolve the claim on direct appeal." *State v. Tate*, 710 N.W .2d 237, 240 (Iowa 2006). We prefer to reserve such claims for development of the record and to allow trial counsel to defend against the charge. *Id.* As "[e]ven a lawyer is entitled to his day in court, especially when his professional reputation is impugned." *State v. Bentley*, 757 N.W.2d 257, 264 (Iowa 2008). If the record is inadequate to address the claim on direct appeal, we must preserve the claim for a postconviction-relief proceeding, regardless of the potential viability of the claim. *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010). Because we find the record adequate in this case, we consider the merits of Pitsenbarger's claims.

As our supreme court has stated, "Claims of ineffective assistance of counsel can arise from most any stage in the criminal proceedings, and can involve most any action or inaction of counsel." *Ledezma*, 626 N.W.2d at 142. Thus, Pitsenbarger's claim, which is in part based upon a failure to object to a voluntary and unresponsive answer to counsel's cross-examination, may support a claim of ineffective assistance of counsel.

"In determining whether an attorney failed in performance of an essential duty, we avoid second-guessing reasonable trial strategy." *Everett*, 789 N.W.2d

at 158. Upon our review, the only strategy defense counsel could possibly use to excuse his failure to object to the improper vouching testimony is the argument he conveyed in closing arguments, that Dawn Wood's testimony was unreliable or "junk science," as defense counsel referred to it. Certainly challenging an expert's opinions is a reasonable trial strategy. But we conclude that arguing the testimony was premised upon junk science without an expert or other evidence to support that claim, in lieu of objecting to the improper vouching testimony, is a strategy that went beyond backfiring. Rather, it was a strategy that had no reasonable chance of success, particularly in light of how pervasive the expert's vouching testimony was in this trial.

**3. Prejudice.** We next consider whether Pitsenbarger suffered prejudice as a result of trial counsel's failure. To establish prejudice, Pitsenbarger must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

In *Brown*, our supreme court found that the expert vouched for the witness's credibility with one line in a report admitted at trial. 856 N.W.2d at 689. The line said, "This examiner agrees this disclosure is significant and that an investigation is clearly warranted." *Id.* at 688. The court found the defendant was prejudiced by the admission of testimony because there was "no physical evidence supporting the State's case. The State's entire case depends on the credibility of [the complaining witness]." *Id.* at 689. The court added, "The expert's statement put a stamp of scientific certainty on [the complaining witness's] testimony. A jury uses this type of expert testimony to bolster the victim's testimony and tip the scales against the defendant." *Id.* We

acknowledge that, unlike our facts, *Brown* was on direct appeal and the supreme court reviewed the admission of testimony for abuse of discretion. *Id.* at 689.

In this action, the State's case also rested entirely on the credibility of the witnesses. In fact, during closing arguments, the State conceded that the case "come[s] down to credibility."[6] The expert's vouching testimony was pervasive— not just a single statement. T.P.'s actions and behavior were given a complete "stamp of approval" by the expert. Further, the expert's testimony vouching for T.P's credibility was emphasized by the prosecutor during closing arguments. As a result we lack confidence that Pitsenbarger received a fair trial and conclude the result may have been different if proper objections had been made to exclude the improper testimony.

We acknowledge in *Tracy*, which similarly dealt with a vouching expert through an ineffective-assistance lens, our supreme court did not grant a new trial solely on the expert vouching testimony. In *Tracy*, our supreme court ultimately found that trial counsel was ineffective and the defendant suffered prejudice, resulting in a new trial for the defendant. 482 N.W.2d at 680. However, the court made it clear that it was not relying only on the admission of the expert's vouching testimony when remanding for new trial. *See id.* at 678 ("However, we choose not to rest our conclusions in the present case upon the *Myers* violation alone."). Notwithstanding, we determine a new trial should be granted in this case as we conclude there was prejudice because of the pervasiveness of the vouching and the importance of the credibility finding of T.P.

---

[6] The State also concedes this point in its brief.

**B. Hearsay.**

Pitsenbarger maintains the district court erred in admitting the hearsay testimony of J.S. and H.M. over Pitsenbarger's objection. Pitsenbarger claims J.S.'s and H.M's testimony of T.P.'s prior consistent statements constituted inadmissible hearsay. However, we decline to address Pitsenbarger's hearsay claims because we do not know if the same witnesses will testify at the new trial or, if they do, what order they will be presented.

**IV. Conclusion.**

Because we find Pitsenbarger's trial attorney failed to perform an essential duty when he allowed the State's expert to vouch for T.P.'s credibility and Pitsenbarger suffered prejudice as a result, we remand for new trial. Because this issue is dispositive, we do not consider Pitsenbarger's remaining claims of error.

**REVERSED AND REMANDED.**